The Republic of Guinea has a Thank you, Your Honor. May it please the Court. Jennifer Weingardner for Global Marine Exploration. The Second Military Craft Act does not apply to in personam claims, and even if it did, it would not apply here because La Trinitae is not a warship on military non-commercial service when it sank. So the real question is, this last provision in the series under the Salvage Act, we're talking about whether the vessel is in non-commercial military service, right? It's not.  This ship, armed with cannons, commanded with someone, a captain appointed by the government, was owned by France, right? Correct. That's not the issue in the case. And the question is whether it was in non-commercial military service, right? Yes, Your Honor. Okay. That would be a question, that would be... It sank in a hurricane. Right. It was en route to engage in conflict with the Spanish. Well, actually, that is an issue of fact for the jury. I'm sorry, for the trier of fact. There is a dispute of fact about it. It's not clear to me that there is. Your Honor, there is a dispute of fact about that. What we know from the historical record and what is difficult because all we have is historical record, right? We can't cross-examine these witnesses. But the history and historical context tells us that the ship left France, that it had orders to avoid Spain at all costs. They were supposed to attack an established Spanish colony. I get that. But that's different from when this ship sank in the hurricane. It was en route to engage Spanish ships. Right? It was an unauthorized route to engage. Does that have to do with the statute? Correct. Does that have to do with the statute? There really are two elements. I think the Chief just laid them out. One is, was it sailing under a foreign country or was it owned by a foreign country here? We agree. It was owned by France. It's not in dispute. And then the second is that second part of the statute of, was it on a non-commercial military service at the time that it sank? Correct. And here, at the time it sank, as the Chief laid out, it seems undisputed that it was chasing the Spanish fleet to engage in some sort of conflict when the hurricane hit it and sunk it. There doesn't need to be a nexus between those two things, whether it's authorized by the King of France at that particular moment or not, does it? Well, the ship was commandeered by a captain who didn't have authority to engage with Spanish. Why does that matter under the statute, I guess, is what I'm asking. The statute merely says, is it owned by a foreign country? Here it was. And then at the time it sank, was it on military service? Those are the elements, as I understand them. But they don't have to be, there's no statutory nexus between those two things, is there? Well, military service would imply that it had orders from the commander, from the crown, to engage in a military act. And what we look at in terms of the record is absolutely not. There was no direct... A French ship with a French captain wearing a French uniform with cannons of France chasing someone to attack them. I think of flying a French flag. Right. Isn't that by nature... We make that assumption. Right. Isn't that by nature a military act, whether authorized at that moment by the King of France or not? I think it has to be authorized by the King of France. Where is the legal authority for that principle, that a plain understanding of the statute requires that it be authorized by the head of state at the moment that it sank? Well, that renders it a military action. I'm asking what the authority for that principle is. I hear you. I understand. But where is the authority for that? We don't have a lot of case law interpreting the Sunken Military Craft Act. Right. It's an understanding of what military means. How is that military? At the moment that someone is flying the flag of the country on a ship owned by the country, on a captain commissioned by that country, with cannons, chasing someone in a military act, how is that not military? Well, what we know is that the ship left port with the directive to not engage in a military act, and that after the massacre occurred, after the passengers disembarked from Le Trinité, there was no military response by France. So France didn't respond, didn't retaliate, didn't do anything. So in the context, in the historical context, there being no directive to engage in a military act and there being no response when that crew was massacred, we can conclude that that was not a military action that was supported by the Crown. I have kind of a broader question. Does it matter what the ship was doing specifically at all? So like, for example, if there's, let's say there's a soldier who's at a fort in the United States and they're like reading a book about gardening in their bunk, are they not on military service? Because they're not doing something they're specifically ordered to do that is to carry out some kind of military function? Well, in that case, that may be the case, but that's not what happened here. Why isn't the question here not about the specifics of what the ship was kind of getting up to when it was out floating around the Atlantic? Why isn't it a broader question about, you know, just whether it was, the statute says, on military non-commercial service, meaning just sort of like what it generally was doing? Well, I think in point of fact, the fact that the statute is so carefully crafted to use the words military non-commercial service acknowledges the fact that there could be a military ship that is transporting cargo and it's not being used for military service in the moment. So the legislators crafted this in a way to specifically protect the craft itself if it was sunk in the course of military service and not being used in any commercial manner. I want to get to your first, the first point you made about the impersonum. Right. I understand your argument relies on Section 1406A of the Act, right? Correct. Whatever the relevant section being is that nothing in this title is intended to affect, and in the first subsection is, any activity that is not directed at the sunken military craft. And you're saying that is relevant to show that that comes out of impersonum actions, right? Correct. Doesn't it specifically reference, though, activities? In other words, nothing in this title is intended to affect any activity that is not directed at the sunken military craft. How is your lawsuit, your impersonum lawsuit, an activity? Your Honor, I see I'm getting close to my time. May I answer your question? Okay. So under 1406A, the specification is that nothing in the Act is intended to affect an activity that is not directed at a sunken military craft. Any activity, and this Court has even held that any activity could mean litigation. So I think that in theory, at its broadest, could. But then the statute goes on to say, so it's any activity or traditional high seas freedoms of navigation, including, and then it lays out certain things that are there, the laying of marine cables, operation of vessels, fishing, or other international lawful uses of sea related to such freedoms. The activity there seems to be discussing activities related to, you know, traditional navigation related issues, not litigation, right? Well, if you look at the end of subsection 1, it says or. So any activity that is not directed at a sunken military craft, that's a standalone application. Or the other activities, including fishing and laying cable and other things like that. What do we mean of the relevant statute here, subsection D, that specifically talks about the law of salvage and specifically references rights and awards? That seems to be targeted to exactly what we're calling lawsuits, separate and apart from what are activities, right? Wouldn't that indicate a different textual reading of activity being one thing and awards and rights being another? No, what we're looking at is the plain language of subsection D. Absolutely. Wouldn't one seem to indicate we're talking about lawsuits and the other is indicating something, an activity that's separate and specifically looking at the entire section, something related to the activity of the vessel or the navigation of it? If I understand your question correctly, what subsection D indicates is law of salvage rights or awards shall be granted with respect to a foreign sunken military craft. So it's to be read consistently, subsection D and subsection A are elements that are directed at a craft itself. Okay, I understand. We understand your argument. Ms. Blank-Gardner, you've saved a couple minutes for rebuttal. Thank you. Given some of your time to amicus, Ms. Bratt. Thanks. Good morning, your honors. I'm Annie Bratt. I'm here on behalf of the amicus legal academics and we are here to argue two specific points. First is that... No parties raised and so I don't know that it's really properly before us. That is the constitutionality of the act. Your honor, the argument we are making is first of all, not that the act is unconstitutional, just raising the issue that there is a constitutional avoidance issue that this court should be aware of. Second of all... If we were to interpret it in a certain way, you think it's constitutionality would be in doubt. I argue that it's constitutionality would be in doubt if you adopt the interpretation that DOJ and France have argued for. On the party presentation idea, the U.S. is now a party to this case. They have intervened and they have specifically brought up constitutionality which brings it directly before this court. Furthermore, this issue directly impacts the subject matter jurisdiction. No party is challenging it though. No party is challenging it. No party has challenged it. We are also not challenging it directly. We are guiding this court towards an interpretation that would avoid constitutional issues with the Sunken Military Craft Act through a narrow interpretation that allows in personam salvage claims. Even if you find that the ship was in fact a military ship, allowing in personam salvage claims avoids the removal of salvage, a traditional maritime action that is protected under Article 3. Even if we reach that argument, it seems to me it's super well established from centuries of jurisprudence that Congress has plenary authority to shape and develop the maritime law of the United States. Maritime law is federal law. Congress is the lawmaking branch. Congress can change the maritime law. And insofar as this pertains to federal jurisdiction, Congress creates the inferior courts and plainly has the authority to withdraw from the federal court certain kinds of claims. In response to your first point, yes, there are centuries of case law that establish that Congress has the authority to make substantive alterations to maritime law. As early as Justice Story's first cases after the writing of the Constitution, he held that the admiralty jurisdiction was exclusive and mandatory in the federal courts. Congress does not have the ability to remove that mandatory jurisdiction. It can make substantive alterations, but it cannot remove the jurisdiction. Other cases... If that were true, that doesn't mean you wouldn't have the authority to remove it from the jurisdiction of an inferior court. That is correct. Congress could, for instance, say that district courts can no longer hear maritime cases, but it could not remove it completely from any federal court. It would have to leave the circuit courts or the Supreme Court available for review. And this is only a question of whether they've removed it from the district court, isn't it? By removing salvage and fines actions, they would remove the federal jurisdiction completely. There would be no cause of action for plaintiffs like GME, other salvers to have jurisdiction under federal admiralty law. The only other circuit that has considered a similar issue considered it under the Abandoned Shipwrecked Act, which affects a similar removal of law of salvage and law of fines claims. And in that case, that court held that that was the only method for getting jurisdiction for federal courts over that specific type of shipwreck action. And that removal raised serious constitutional concerns, just as this does. I think we understand the argument, Ms. Bright. You've saved some time for rebuttal. Let's hear from... Thank you. Thank you, Your Honor. James Gould for the Republic of France. Let me begin in 1564, which I not ordinarily, cannot ordinarily do, if you don't mind. I picked 1564 because in the record document, 77-1 at 10, are the orders that were issued in 1564 not 1565, to the commander of the group that set out to establish the fort. These are orders from the admiral? No, these are the orders to the Commandant Laudanier who was sent with the colonists to create that fort. And he was given specific instructions, 77-1 at 10, not to get in trouble with the Spanish. Obvious point. 1565. So the whole argument you've been hearing is a construct from something that was an order given the commander of the colonists. Not what happened a year later when France learned that Spain was sending a fleet to slit their throats. Does any of that matter? I mean, if it does, tell me. But if it doesn't, I'm interested. There's really two components of it. One is the ownership component, what I'll call the ownership component. And that's not in dispute. France owned the vessel. And the second is whether at the time it was sunk, it was a non-commercial military service. Does that require that? Let's say the guy was clearly working for France, clearly wearing French uniform, clearly flying the French frag, clearly aiming to do things for France, but was not acting pursuant to any specific orders from either the commandant, the admiral, or the king himself. I may be gilding the lily, but another basis for the act to apply is to a ship of war, regardless of what it was doing. Let's talk about that. The other vessel. So as to that, again, Captain Rubell was given orders not to allow the Spanish to encroach. I want to hear what you have to say, but I want you to answer my question, which is, do you see a nexus requirement in the statute that requires that France specifically authorize it for it to be a military mission? No, not at all. Not whatsoever. Even if at the moment you're making a reservation from what your orders were, as long as you were doing military acts, for instance, flying your country on a boat owned by your country, wearing the uniform of your country, attacking the enemy of your country or one that had threatened your country's property? Absolutely, Your Honor. And especially if you're on one side of the Atlantic at a time when it took two months for orders and instructions to reach you from home. So you agree that the statute doesn't have a nexus requirement in that way? As to the military activity, it's simply that it sank at the time while it was engaged in military non-commercial activity. And we know that the ship embarked to attack the Spanish with, and there's an interrogation in the record by one of the French captains who survived and was captured by the Spanish, that there were 400 hand-picked soldiers and 200 sailors all set out to attack the Spanish. That's military non-commercial activity. I'll move on then as to the salvage points. First, I'll just say that as speaking from Francis' point of view, there are abundant reasons why one need not reach the constitutional issue anyway. The first is because this is an in personam salvage claim, and in personam salvage claims were delineated by the Supreme Court in the Sabine, a venerable case, 101 U.S. 784, 384, that an in personam claim arises when the would-be salver is quote, sent out by the owner. France had nothing whatever to do with what GME did. They did that all as part of a deal with Florida, which they ultimately forfeited because of violating Florida law, but in any event, France was nowhere in the picture when GME embarked upon what it did. In addition, there can be no salvage where this owner has refused salvage. That's in this circuit in the international aircraft case, 218 F. 3rd. Can you address the statutory argument they make regarding 1406 A and the term activity? Yes. Well, I think the Your Honor's pointed exactly to the point that the activity is illustrated by specific examples, and if you Those examples apply to subsection or the 1406 A 1 and 2 Yes. That's the argument that your opposing counsel made. I think that supplies context, and to begin with, if 1406 A 1 were to exempt in personam salvage claims from the Act, Congress would have had to say so. In personam salvage claims was something established by the Supreme Court at least a hundred years before. There's a reason, therefore, implicitly that Congress chose not to address Well, whether it be covered up in personam or not, the question simply is is this lawsuit an activity that is not is this lawsuit seeking to recover damages for an activity that is not directed at the sunken military craft? That's really the question. And if you look at the amended complaint, for example, the very first sentence reads, this action relates to valuable shipwreck sites discovered by GME. And throughout the complaint, all of the allegations are geared to the idea, and these are their words, that they had a right and entitlement to this shipwreck site arising through their dealings with Florida, not France, by the way. So, I don't think on its face one cannot say that this is not an activity directed at a sunken military craft. So you would assume, for constitutional purposes, that that statute theoretically carves out something this lawsuit would not be within that bar about, right? Right. Absolutely,  Unless there are any further questions about the Sunken Military Craft Act and my... I wanted to ask a question about the state law claims, because I realized when you talked, it was in Jacksonville, and my panel ruled against you on the Foreign Sovereign Immunity Act issue. Yes. And part of the conclusions in that opinion and sort of what motivated that opinion was the perception that this was more of a unjust enrichment, trade secrets kind of case. So, could you just address why you think the district court was correct to reject those state law claims? Yes, Your Honor. First, of course, as I've mentioned, France had nothing to do with what GME set out to do. GME explicitly alleges that it, quote, acted in reliance on program rights, close quote, conferred by Florida. GME claims it was promised 80% of any recovery by Florida. All of that is by the boards, by the way, because of the violations that were determined by GME of its dealings with Florida. But that's the beginning part. The next is that GME brought these claims after they laid claim to this ship in GME 1, denied that it was France had to go to court to prevail that this was French property. So the unjust enrichment, put that in quotes, is that France had to go to court and win its property back from GME. That's not unjust enrichment by any reasonable construction of the term, especially when as in the cases we've cited, tool trend and sky track in Florida Supreme Court tipper, you can't force yourself upon someone doing services that they know nothing about, that they did not authorize, and then go and say, okay, I lost my lawsuit, here's the bill. Can I go to the tortious interference claim? So you've talked about the unjust enrichment claim. Yes. The tortious interference claim, they respond that, yeah, okay, we get that you had a privilege with regard to Site 2, but with regards to Sites 1 and 3 through 6, France is not claiming that that's French property, and you interfered by getting involved in this thing with the state of Florida. Are rights that we would have had to explore these other sites and get whatever is valuable from these other sites? Several points on that, Your Honor. First, France claimed the area which GME defined as that which encompassed the site they claimed was unidentified. France prevailed on what GME claimed in GME 1. Yes, as to Site 2, but there was no exclusion of these other sites from the area that GME defined. Second, and perhaps even more directly, the Florida Department of Historical Resources, Florida Department of State, and the, I think it's the 11th Florida DCA District Court of Appeals, all affirmed that GME has no right to interfere with those sites anymore because they violated the law at Site 2 and forfeited their license. All of that took place without anything of France having anything to do with it. There's no indication of any interference of any sort other than France going to court and winning that the area... Your position is the only thing that France is doing is protecting its lawful interest. It doesn't have any kind of purely malicious motive. It wants to protect its shipwrecks. There's no finding whatsoever of any improper motive or conduct by France to protect what is absolutely unique and irreplaceable French cultural heritage which it seeks to share with Florida by museum and the like. Thank you, Your Honor. Thank you. Good morning. May it please the Court. Laura Myron for the United States. As this case comes to the Court, the dispute between the parties has been whether in personam as well as in rem salvage claims are prohibited. At no point in district court or in the opening brief before this Court has a party raise the argument that understanding the statute that way would be constitutionally suspect. It would be extraordinary for this Court to reach out and conclude that the statute was unconstitutional in that posture. But I would like to also address the constitutional avoidance claims, particularly I think the question about whether section A of 1406 modifies section D. I think the statute is best read to understand section 1406A as modifying section 1402A and not as modifying the subsequent provisions in 1406. And I think that you get that from the fact that A prohibits any activity that disturbs, removes, or injures any sunken military craft. And then 1406A says except, you know, as to the extent an activity is undertaken as subrefuge for prohibited activities, it is not intended to affect any activity that is not directed at a sunken military craft, and then goes on to address some Yes, Your Honor. The specific disturbance of the sunken military craft, and the statute, I think the context in which the statute was enacted provides helpful information about that, particularly as it was intended to serve three purposes, to protect the final resting place of military service members, to ensure the public safety and environmental effects of oil or unexploded ordnance or even nuclear material that may be on board military craft, and also to ensure that, you know, any military or state secrets that might be implicated Aren't they? Isn't Global asking for compensation for activities that are directed, physical activities that are directed at the sunken ship at Site 2 specifically finding it, coordinating it, diving, they even took some artifacts specifically to confirm what it was, and they were able to confirm what it was. Isn't that what they're seeking under their impersonal lawsuit? I think so, Your Honor, but the sort of provision in D of the statute precludes rights or awards to be granted with respect to any United States or foreign sunken military craft and so at the point at which the ship was identified as a sunken military craft within the meaning of the statute, that statute then operates to preclude any claims or rights to be granted at that point. Certainly the court So what's the limiting principle for A? In other words, I don't disagree with what you're saying, and certainly, I think, just reading DOI itself, it would cover exactly what they're asking for here, but what's the limiting principle that we have with regard to A? I'm not sure what you in which direction you mean. I mean, certainly the section 1406A or 1402? I mean, it says that nothing in the title is intended to affect activities that are not directed at sunken military craft. That includes filming, a number of other things that might take place near the sunken military craft. I think it would also affect, although I haven't for those things. Why do they not have an impersonum claim as to that? They're seeking salvage right or award with respect to a foreign sunken military craft, and that is specifically precluded by the Act. It's precluded by 1406D. It's not precluded by the prohibition in 1402, which is directed at engaging or attempting to remove or disturb. There's never been an allegation that they have somehow violated the Sunken Military Craft Act by engaging in the activities that they've engaged in. The question is whether they can seek the kind of salvage rights that they're claiming are in personam, and the statute in 1406D says that those rights or awards shall not be granted. Would you address the issue that you mentioned in your brief about how the other craft, how the noncommercial use only modifies other craft and not warship? Yes. There are multiple textual indicia that that is the correct reading of the statute. The rule against last antecedent, the rule against surplusage, the context, as I mentioned, would be somewhat unusual to think that what Congress intended was for the United States to have to litigate whether a warship was on noncommercial service because it was carrying nonmilitary cargo at the time, which was historically quite common. And there are, I think, many textual indicia to explain that that is not the proper reading of the statute. And I would also just add one last point that interpreting the statute in that way and also interpreting the statute to exclude in personam claims does not, in fact, address the constitutional problem that's being raised and, therefore, it would not be an appropriate instance for the application of constitutional avoidance. I see a matter. I'm not sure you take a position about this in your brief. Maybe you do. I just didn't see it. If we interpret the statute the way you're suggesting, in this case, would we say that this ship is a warship and not address the noncommercial use or would this still be another ship? I don't have a position on that, Your Honor, only to say that those are two separate categories and then that's the way the statute should be applied. Yes, Your Honor. Thank you. One more. Your Honors, if Congress intended to remove a whole swath of recovery in personam, it would have said that explicitly in the Sunken Military Craft Act. Instead, what it did was very, very carefully carve out the application of the Sunken Military Craft Act to be those claims directed at the shipwreck itself. In this case, GMU's claims are directed at France for its present day activities. This Court in a different panel has already found that France is amenable to in personam. It can be sued in personam for its activities and the claims that are before the Court involve in personam claims against France, not directed at the Act. What we're hearing today is that France wants to come here and receive the benefits of all of GME's work and not pay at all or compensate GME at all for the value of that and that it is in direct conflict with centuries of admiralty law, state law claims and what we're seeing is that France is asking this Court to say that it can have its cake and eat it too. That just violates canons of directly the statutes, the law and just what's right and fair and equitable. If the Court has no other questions, I'll concede the rest of my time to Ms. Brett. Thank you, Ms. Brett. Thank you. I'd like to begin by following up on Judge Luck's questions about the limiting principle of 1406A and how we can interpret any activity. I would read 1406A 1 specifically in line with 1406A2 to understand activities as traditional maritime activities such as the traditional maritime high seas freedoms that we see in 14062. Any activity certainly includes salvage activities. That is something that is a core part of traditional maritime law and practice and should be read to include these types of salvage actions. If we think of any activity in 1406A as any maritime activity that might be directed at a vessel that would absolutely include a salvage claim like the one being brought here in personam. I think it's a perfectly permissible construction to read 1406A and 1406D such that salvage claims that are not directed at a vessel, such as those directed at its cargo, those directed at its owner, those directed at the proceeds of its sale, all of which are historical types of claims or activities that one might engage in against a vessel, that those are permissible under this statute. That avoids the constitutional concerns that we have brought up earlier and ensures that the federal courts retain jurisdiction of these types of salvage actions. I would also like to follow up on some of the points earlier about military service. Military service, obviously, I'm aware of it mostly in the context of maritime military service and naval service. In this era, it was very common to have Marines on vessels that were cargo vessels. The Dutch East India Company, all these very, very valuable ships carrying very valuable cargo typically had military officers on board. The distinction here is that those military officers being duly commissioned, having a gun on a ship, does not make that ship on military service. To be on military service, the ship itself must be under orders from the government. That is not what was going on here. Yes, there was an officer on board. Yes, there were some cannons. That does not constitute military. To be military... I mean, inherently, all of that does not make it military service at the time it sunk, but it seems to me that the undisputed record is that, and I don't know that you have a position on this, is that at the time they left port to go after the Spanish and a hurricane happened to hit them at that time. I mean, at that point, they were engaging in military acts, were they not? Assume that the record is what I just stated. Assume that the record is what you stated. An interpretation of the Sunken Military Craft Act that requires judges to inquire into the intent of the officer on board at the time of the sinking is a interpretation that I think is not in line with what Congress intended or what General Maritime Law... Well, it's not clear like the sovereign... The sovereign... That's what the text says, isn't it? The sovereign dictates military activity. An individual officer cannot decide to send France to war. That is not within the purview of any one captain. It is the purview of the King of France to declare war and to send a vessel on a military mission. It should be very clear in the sovereign's orders that that was the intent for it to be military service. It should not be a minute-by-minute inquiry into the mindset of the person that happens to be on a ship. That's an impossible inquiry, and it's one that Congress could not have intended this Court to engage in. Thank you, Ms. Bradford. We're in recess until tomorrow. Thank you.